**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LARSON TEXTS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:19-cv-297-SPB |
| v. | ) | |
| | ) | |
| SCOTT O'NEIL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The instant civil action arises out of an attempt by shareholders in a closely held corporation to effectuate a distribution of additional shares of stock to certain of the voting members. Plaintiffs in this case are Larson Texts, Inc. and four of its voting shareholders (collectively, "Plaintiffs"). The Defendant is Scott O'Neil, a voting shareholder who would not be receiving additional stock shares under the subject stock distribution plan. Plaintiffs seek a declaratory judgment that would establish the validity and fairness of the plan and foreclose any countersuit by Defendant for breach of fiduciary duty or self-dealing.

Pending before the Court is the Defendant's motion to dismiss the instant action for lack of subject matter jurisdiction and/or for failure to state a claim. For the reasons that follow, the motion will be denied.

## I.    Background

Larson Texts, Inc. ("Larson Texts" or the "Company") is a Pennsylvania corporation engaged in the creation and publication of math textbooks for students ranging from kindergarten

1

age through college age.  Compl. ¶¶1, 9.[1]  Larson Texts has been operating in the textbook industry for decades.  Id. ¶10.

The Company has a total of seven shareholders, five of whom hold voting shares. Compl. ¶¶11-12.  Those with voting shares include Defendant Scott O'Neil (hereafter, "O'Neil" or "Defendant") as well as Plaintiffs Roland Larson, Deanna Larson, Timothy Larson, and Jill Larson Im (hereafter, the "Individual Plaintiffs" or "Shareholder Plaintiffs"). Id.  Each of these five individuals holds 60,000 Class A voting shares in the company. Id.

Due to the buying patterns of the Company's customers, Larson Texts receives much of its yearly revenue between the months of July and September.  Compl. ¶13.  To provide the necessary cash flow for its operations throughout the fiscal year, Larson Texts has historically utilized various loans and lines of credit.  Id. ¶14.  Since at least 2004, the Company's lender has required that all voting shareholders provide personal guaranties to secure the Company's lines of credit.  Id. ¶15.  Up until 2019, all of the voting shareholders agreed to do so.  Id. ¶16.

In early 2019, however, Larson Texts needed to increase its borrowing capacity through an additional $3,000,000 loan with one of its lenders. Compl. ¶17.  Consistent with prior practice, the lender requested that all voting shareholders provide personal guaranties to secure the loan. Id. ¶18.  Although O'Neil refused to provide a personal guaranty for the new loan, the lender ultimately agreed to provide the loan if the other four voting shareholders covered the requisite guaranty.  Id. ¶¶19, 21-23.

As an incentive to secure the necessary guaranties, Larson Texts offered a guaranty compensation plan (the "Guaranty Plan") to all of the voting shareholders.  Compl. ¶¶24-25.

---

[1] For present purposes we assume the truth of the well-pled allegations in the Complaint.

2

Under the terms of this plan, any voting shareholder who agreed to provide a personal guaranty for the new loan would receive additional voting shares in Larson Texts.  Id. ¶26.  The amount of additional shares was to be calculated based upon the number of voting shareholders who participated in the Guaranty Plan, the value of the guaranties, and the current value of Larson Texts' voting shares.  Id. ¶¶27-28.  To that end, Larson Texts retained an outside accounting firm to perform a valuation of the Company, the personal guarantees, and the voting shares.  Id. ¶¶27, 29, 36.

The firm ultimately determined that the collective value of the guarantees was at least $60,000.00, and the value of each Class A voting share in the Company was worth $24.53. Compl. ¶¶29-30, 37.  Based upon these valuations, the Guaranty Plan called for each participating shareholder to receive 611 additional shares of Class A voting stock. Id. ¶38.

Although the Guaranty Plan was offered to all voting shareholders, O'Neil declined to participate in the plan.  Compl. ¶¶32-35.  The remaining voting shareholders did agree to participate and gave their personal guarantees for the additional $3 million loan. Id. ¶¶34-35.

When Larson Texts attempted to obtain formal approval of its plan to issue the additional shares at a special shareholder meeting, O'Neil objected on the grounds that he believed the Guaranty Plan was inappropriate and the $24.53 valuation of the voting shares was too low. Compl. ¶¶39-41.  O'Neil further accused the Plaintiff Shareholders of intentionally supplying the outside valuation firm with information that was designed to suppress the value of the stock and thereby allow the Plaintiff Shareholders to acquire more shares for themselves.  Id. ¶42.

Plaintiffs now claim that O'Neil has engaged in a "series of actions . . . in which he ha[s] refused to agree on a value for Larson Texts' stock."  Compl. ¶43.  According to the Plaintiffs, this has created "a significant problem for Larson Texts because the Company and its

3

shareholders are parties to a Shareholder Agreement which requires the Company to repurchase stock in certain circumstances at an agreed upon or arrived at value." Id. "Without an agreed-upon value in place," Plaintiffs say, "Larson Texts is unable to properly plan for its potential repurchase obligations." Id.

Plaintiffs contend that, since 2003, when the Shareholder Agreement was executed, the Company's shareholders have utilized an established process to arrive at an agreed-upon value of Company shares for purposes of carrying out the Shareholder Agreement. Compl. ¶44. That process has included the retention of a particular outside firm to conduct a valuation of both voting and non-voting shares. Id. On at least two occasions since 2018, however, O'Neil has refused to agree to the value arrived at by this outside firm. Id. ¶45. This includes not only the firm's most recent valuation but also a prior valuation dated December 31, 2017. Id. ¶45. Plaintiffs believe that O'Neil would presently value the stock at $67.23 per share, or greater, based upon the December 31, 2017 valuation, which O'Neil himself rejected at the time. Id. ¶¶47-48. If this higher valuation is accepted, it would mean that the shares the Company seeks to distribute to the Plaintiff Shareholders under the Guaranty Plan would be worth more than $164,000, rather than the $60,000 in value as determined by the 2019 valuation. Id. ¶49.

Plaintiffs theorize that O'Neil's refusal to agree on a value is "an effort on his part to place Larson Texts and the Individual Plaintiffs in a position where they are unable to carry out their fiduciary obligations without risk of his filing suit against them." Compl. ¶46. They claim O'Neil has opined that Larson Texts and the Individual Plaintiffs are engaging in intentional conduct aimed at benefiting themselves, to his own detriment. Id. ¶50.

As set forth in the Complaint, Plaintiffs "believe the 2019 Valuation accurately determined the value of Class A voting shares in Larson, and they disagree that the other voting

4

shareholders have engaged in any inappropriate or self-dealing conduct." Compl. ¶52. They

filed this civil action on October 17, 2019, requesting that the Court declare: that the Guaranty

Plan does not violate Larson Texts' obligations or its voting shareholders' obligations to O'Neil,

that the 2019 Valuation represents the fair market value of shares in Larson Texts as of its

effective date, and that Larson Texts may complete the Guaranty Plan by issuing 611 shares to

each of the four participants in the Guaranty Plan. *See* Compl. Ad Damnum Clause.

O'Neil has moved to dismiss this case for lack of subject matter jurisdiction and for

failure to state a claim. See Fed. R. Civ. P. 12(b)(1) and (6). O'Neil argues that this lawsuit is

not ripe for adjudication because it fails to present any case or controversy. He also challenges

the validity of the Guaranty Plan, arguing that it lacks any legitimate authoritative basis and

violates the terms of the Shareholder Agreement. The Defendant's motion is sufficiently briefed

and is now ripe for adjudication.

## II.    Standard of Review

### A.  Dismissal Under Rule 12(b)(1)

A Rule 12(b)(1) motion to dismiss addresses "the very power [of the court] to hear the

case." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Because

the Plaintiffs are the parties asserting jurisdiction, they bear the burden of showing that their

claim is properly before the court. *See Development Fin. Corp. v. Alpha Hous. & Health Care,

Inc.,* 54 F.3d 156, 158 (3d Cir. 1995).

In addressing this jurisdictional challenge, the Court must first distinguish between two

types of Rule 12(b)(1) motions: those that involve facial attacks and those that involve factual

attacks. A facial attack is "an argument that considers a claim on its face and asserts that it is

insufficient to invoke the subject matter jurisdiction of the court." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3rd. Cir. 2014). A facial attack can occur any time before the moving party has answered the complaint or contested any factual allegations of the complaint. *Id.* at 358. When reviewing a facial attack, the court must accept the factual allegations as true and construe them in the light most favorable to the plaintiff. *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3rd. Cir. 2012). In essence, the court must apply the same standard of review that it would use in considering a motion to dismiss under Rule 12(b)(6). *Aichele*, 757 F.3d at 358.

Alternatively, a factual attack is an argument that subject matter jurisdiction does not exist "because the facts of the case ... do not support the asserted jurisdiction." *Aichele,* 757 F.3d at 358. For factual attacks, courts can consider evidence outside of the proceedings, and the allegations contained in the complaint are not presumptively true." *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008). Because a factual attack requires a factual dispute, the party asserting the challenge must file an answer or otherwise present competing facts. *Mortensen,* 549 F.2d at 892 n.17 (" factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted."); *Aichele*, 757 F.3d at 358.

In this case, O'Neil's jurisdictional challenge is in the nature of a facial attack. He claims that, on its face, the complaint fails to present an actual case or controversy and, therefore, this case is not ripe for adjudication. That challenge will be addressed below.

B. Dismissal Under Rule 12(b)(6)

Rule 12(b)(6) recognizes a defense based on the Plaintiff's failure to state a claim upon which relief can be granted. When considering a Rule 12(b)(6) motion, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." *Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509,

526–27 (3d Cir. 2018) (internal quotation marks and citations omitted).  In order to survive

dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "As a general matter, a district court ruling

on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington

Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997). "However an exception to the

general rule is that a document integral to or explicitly relied upon in the complaint may be

considered without converting the motion to dismiss into one for summary judgment." *Id*.

(quotation marks and alterations omitted).

## III.    Discussion

The Declaratory Judgment Act, 28 U.S.C. §2201 et seq., creates a remedy by which

federal courts "may declare the rights and other legal relations of any interested party seeking

such declaration" when there is a "case of actual controversy."  28 U.S.C. § 2201(a).  "The

Supreme Court, in upholding the constitutionality of the Act, has interpreted the remedy as

limited to cases and controversies in the constitutional sense." *Wyatt, Virgin Islands, Inc*., 385

F.3d 801, 805 (3d Cir. 2004) (citing *Aetna Life Insurance Co. of Hartford, Conn. v. Haworth*,

300 U.S. 227, 240 (1937)).  This means that "[t]he conflict between the parties must be ripe for

judicial intervention; it cannot be 'nebulous or contingent' but 'must have taken on fixed and

final shape so that a court can see what legal issues it is deciding, what effect its decision will

have on the adversaries, and some useful purpose to be achieved in deciding them.'" *Id*. (quoting

*Pub. Serv. Comm'n of Utah v. Wycoff Co*., 344 U.S. 237, 244 (1952)).

  A. <u>Defendant's Arguments on Ripeness</u>

   In his motion to dismiss, Defendant argues that Plaintiffs have not pleaded the existence

of a case or controversy under the Declaratory Judgment Act.  Defendant insists that the

Plaintiffs' request for a declaratory judgment is not ripe because Plaintiffs failed to present any

authority or legal basis to support the Guaranty Plan or the 2019 Valuation.  According to

O'Neil, the Plaintiffs have suffered no "injury" that would entitle them to declaratory relief;

therefore, Plaintiffs are essentially requesting an advisory opinion sanctioning their unauthorized

actions relative to the Guaranty Plan and the 2019 stock valuation.

   "At its core, ripeness works 'to determine whether a party has brought an action

prematurely ... and counsels abstention until such a time as a dispute is sufficiently concrete to

satisfy the constitutional and prudential requirements of the doctrine.'" *Plains All Am. Pipeline*

*L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quoting *Peachlum v. City of York*, 333 F.3d 429,

433 (3d Cir. 2003)). "A dispute is not ripe for judicial determination if it rests upon contingent

future events that may not occur as anticipated, or indeed may not occur at all.  Claims based

merely upon assumed potential invasions of rights are not enough to warrant judicial

intervention." *Wyatt,* 385 F.3d at 806 (3d Cir. 2004) (internal citations and quotation marks

omitted).  Courts in this judicial circuit consider the following factors when determining whether

a case is ripe: "'the adversity of the interest of the parties, the conclusiveness of the judicial

judgment[,] and the practical help, or utility, of that judgment.'" *Marathon Petroleum Corp. v.*

*Sec'y of Fin. for Delaware*, 876 F.3d 481, 496 (3d Cir. 2017) (quoting *Step-Saver Data Sys., Inc.*

*v. Wyse Technology*, 912 F.2d 643, 647 (3d Cir. 1990)).

Here, the Court is satisfied that Plaintiff's declaratory judgment action presents an actual case or controversy that is ripe for judicial review.  In his brief, O'Neil plainly opposes the Company's consummation of the Guaranty Plan.  He contends that both the Guaranty Plan and the 2019 stock valuation "are without any legal authorization."  ECF No. 7 at 7.  He further insists that, if this Court were to grant the requested declaratory relief, the judgment "would effectively dilute [his] ownership interest" in the Company, impermissibly "interfere with corporate and shareholder governance," and "authoriz[e] the Plaintiffs' manufactured scheme to alienate the Defendant from the other shareholders."  ECF No. 7 at 7-8.  These very arguments demonstrate that the parties' have competing claims and objections regarding the validity of the Guaranty Plan and the fairness of the 2019 stock valuation.  It is these competing positions that comprise the dispute in this case.  See ECF No. 10 at 6.

Further, the Court is satisfied that the parties possess adverse legal interests.  Adversity in this context involves consideration of "[w]hether the claim involves uncertain and contingent events, or presents a real and substantial threat of harm." *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006) (citation omitted).  Here, Plaintiffs wish to distribute additional voting shares in accordance with the terms of the Guaranty Plan, but Defendant has stated his opposition to such distribution and has further opined that the contemplated stock distribution would be unlawful. In this Court's view, a real and substantial threat of harm exists in that Plaintiffs can reasonably expect the Defendant to file suit if the Guaranty Plan is consummated.  Defendant insists that the Plaintiffs have failed to demonstrate any actual, present injury; importantly, however, "[i]t is not necessary for the party seeking review to have suffered a completed harm in order to establish adversity of interest so long as there is a substantial threat of real harm that remains throughout the course of the litigation." *Surrick,* 449 F.3d at 527.  Given the Plaintiff's intention to proceed

Page | 9

9

with the terms of the Guaranty Plan and Defendant's strong and consistent opposition thereto, there exists a substantial threat that Defendant will challenge the legality of the Plaintiff's actions if the Plaintiffs proceed with their plan.  Moreover, to the extent that the Individual Plaintiffs have any legitimate claim to the additional voting shares by virtue of having increased the value of the Company as a result of personally guaranteeing the $3 million loan,[2] the Shareholder Plaintiffs are currently experiencing harm in the form of being deprived their additional shares, and the Company is experiencing harm in that it is potentially in breach of its putative obligation to these shareholders.

Next, the Court finds that the Plaintiffs have presented sufficiently concrete facts to permit a conclusive judicial judgment. "A claim is fit for adjudication if a 'declaratory judgment would in fact determine the parties' rights, as distinguished from an advisory opinion based on a hypothetical set of facts.'" *Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 523 (3d Cir. 2018) (quoting *Surrick*, 449 F.3d at 528).  Here, the parties have clearly defined their respective legal positions concerning the validity and fairness of the Guaranty Plan and subject stock valuation.  There is no suggestion that the parties' positions will change.  A declaratory judgment will resolve whether the proposed stock distribution comports with Pennsylvania law and the terms of the governing Shareholder Agreement or whether, in some respect, it would violate the Defendant's rights.  The facts, as outlined above, are sufficiently concrete for the Court to fashion relief that would conclusively decide the present controversy.

---

[2] The validity of the Plaintiff shareholders' claim that they are entitled to additional voting shares goes to the merits of their underlying claim, not the ripeness of it.

10

For the same reasons, a declaratory judgment in this action will provide a useful benefit to the parties.  If the Court decides the issues adversely to Plaintiffs, then Larson Texts will know that it cannot lawfully proceed with the planned stock distribution and it will presumably abort that plan.  If, on the other hand, the Court decides the case favorably to Plaintiffs, then the Company can proceed with the intended stock distribution free of concerns that any of the Plaintiffs will incur future liability as a result of the transaction.

Based upon the foregoing considerations, Defendant's motion to dismiss the complaint for lack of ripeness under Rule 12(b)(1) will be denied.

B.  <u>Defendant's Arguments Under Rule 12(b)(6)</u>

Defendant also moves to dismiss the instant action for failure to state a claim upon which relief can be granted.  With respect to the merits of Plaintiffs' request for declaratory relief, O'Neil argues that there is no legal authorization to support either the Guaranty Plan or the 2019 valuation.  He characterizes the plan as a "scheme" whereby the shareholder Plaintiffs intend to obtain additional voting shares, to his own detriment and prejudice.  As noted, O'Neil maintains that Plaintiffs have suffered no injury, since they obtained the loan in question and there is presently no issue regarding default.  He also suggests that Plaintiffs never investigated whether they could have obtained the requisite financing from an alternative source that would not have required the personal guaranties.  From a pleading standpoint, O'Neil faults Plaintiffs for failing to submit a copy of the Guaranty Plan with their complaint.  He also argues that the Guaranty Plan violates the terms of the Shareholder Agreement, a copy of which he has submitted in support of his motion to dismiss.  *See* ECF No. 6-1.

At this point in the proceedings, Plaintiffs need do no more than provide factual content sufficient to support a plausible inference that they are entitled to relief.  *Iqbal*, 556 U.S. at 678;

11

*Twombly*, 550 U.S. at 570.  This modest pleading standard "'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]" of Plaintiffs' claims.  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556 n.3).

        In this Court's estimation, Plaintiffs have satisfied their modest pleading burden.  Defendant's arguments in favor of dismissal may ultimately give rise to valid defenses, but they do not establish that the Complaint is facially deficient in terms of stating a basis for the requested declaratory relief.  Moreover, to the extent O'Neil's submission of the Shareholder Agreement might support his position, the Court declines to consider that document at this time.  The Court agrees with Plaintiffs that their claimed entitlement to additional voting shares under the Guaranty Plan is not dependent upon the terms of the Shareholder Agreement.  Thus, that agreement is neither explicitly relied upon by Plaintiffs nor integral to their claim for declaratory relief.

        For these reasons, the Defendant's motion to dismiss the complaint under Rule 12(b)(6) will be denied.

        C.   Defendant's Argument for Discretionary Abstention

        In his reply brief, O'Neil argues for the first time that the Court should exercise its discretion to decline jurisdiction over this case.  Under the Declaratory Judgment Act, district courts have "discretionary, rather than compulsory, jurisdiction...." *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 134 (3d Cir. 2014) (citing *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942)).  Thus, a declaratory judgment is an exception to the general rule that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (citing *Colo. River Water*

12

*Conservation Dist. v. United States*, 424 U.S. 800, 821 (1976)).  In their discretion, district courts

may stay or dismiss an action seeking a declaratory judgment "before trial or after all arguments

have drawn to a close." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995).  District courts

possess this discretion even in cases, like this one, where subject matter jurisdiction is otherwise

present. *Id*. at 282.

       The Third Circuit requires district courts to weigh several factors in deciding whether to

entertain a declaratory judgment action.  One factor weighing heavily *against* a district court

exercising jurisdiction is the presence of a parallel state court proceeding.  *Kelly v. Maxum

Specialty Insurance Group*, 868 F.3d 274, 282 (3d Cir. 2017).  In the absence of a parallel

proceeding, federal courts should consider: (1) the likelihood that a federal court declaration will

resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of

the parties; (3) the public interest in settlement of the uncertainty of obligation; (4) the

availability and relative convenience of other remedies; (5) a general policy of restraint when the

same issues are pending in a state court; (6) avoidance of duplicative litigation; and (7)

prevention of the use of the declaratory action as a method of procedural fencing or as a means to

provide another forum in a race for res judicata. *Id*. at 283. Courts may also "weigh other factors

bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for

[federal] resolution." *Id*. (alteration in original) (internal quotation marks and citation omitted).

       In this case, the record is somewhat undeveloped as it relates to the above-mentioned

factors.  The Court does note, however, that there has been no indication of parallel state court

proceedings, which alleviates concerns about comity and duplicative litigation.  Also, the

complaint makes clear that Larson Texts is headquartered in Erie, Pennsylvania, where this

Court sits; therefore, it would seem convenient for the parties to address their corporate dispute

in this forum.  Finally, for the reasons stated, it seems likely that a declaratory judgment by this Court will resolve the uncertainty of corporate obligations which gave rise to the present controversy.  On balance, these factors appear to favor the Court's exercise of federal jurisdiction under the Declaratory Judgment Act.

In any event, however, the Court has discretion to dismiss the action at a later stage, should further developments so warrant.  *See Wilton,* 515 U.S. at 288; *see also Nationwide Mut. Fire Co. v. Shank*, 951 F. Supp. 68, 70 (E.D. Pa. 1997) (court citing *Wilton, supra,* and noting that it "can stay or dismiss an action at any time").  For present purposes, the Court will decline Defendant's invitation to dismiss the litigation and will continue, instead, to exercise subject matter jurisdiction over the instant case.

## IV.    Conclusion

Based upon the foregoing reasons, the Defendant's motion to dismiss will be denied.  The denial will be without prejudice to Defendant's right to argue in favor of discretionary dismissal at a later stage of these proceedings, should future circumstances so warrant.

An appropriate Order follows.