IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LARSON TEXTS, INC., et al., | ) |
| Plaintiffs, | ) Civil Action No. 1:19-cv-297-SPB |
| v. | ) |
| SCOTT O'NEIL, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

**Susan Paradise Baxter, United States District Judge**

This litigation arises out of a dispute between Scott O'Neil ("O'Neil"), a minority shareholder and former director of Larson Texts, Inc., and the remaining shareholder/directors, all of whom -- unlike O'Neil -- are members of the Larson family. The case began as a declaratory judgment action filed by Larson Texts, Inc., Roland Larson, Deanna Larson, Timothy Larson, and Jill Larson Im (collectively, "Plaintiffs"). O'Neil, the only named Defendant, has asserted counterclaims for breach of fiduciary duty, shareholder oppression, and civil conspiracy.

Pending before the Court is the Plaintiffs' motion for partial summary judgment as to O'Neil's claims of shareholder oppression and civil conspiracy. For the reasons that follow, the Plaintiffs' motion will be granted in part and denied in part.

1

I.  **FACTUAL BACKGROUND**[1]

Larson Texts, Inc. (hereafter, "Larson Texts" or the "Company") is a closely held company engaged in the creation and publication of math textbooks. ECF 51, ¶1; ECF 57, ¶1. The business was originally formed by Roland Larson as a sole proprietorship and was formally incorporated in 1992. ECF No. 51, ¶4; ECF 57, ¶4; *see* ECF No. 51-1, O'Neil Depo. at 15.

At all times relevant to this lawsuit, Larson Texts has had five voting shareholders, each of whom holds an equal twenty percent (20%) of the voting stock, *to wit*: Roland Larson, Deanna Larson, Timothy Larson, Jill Larson Im, and Defendant O'Neil. ECF 51, ¶¶2-3; ECF 57, ¶¶2-3; ECF No. 1, ¶¶11-12; ECF No. 19, ¶¶11-12. Timothy Larson and Jill Larson Im are the children of Roland and Deanna Larson. O'Neil is the only voting shareholder who is not a member of the Larson family.[2]

At the time of Larson Texts' incorporation, O'Neil served as the Company's chief executive officer ("CEO"). ECF No. 51, ¶4; ECF 57, ¶4. In February 2010, O'Neil voluntarily resigned as CEO but continued to serve both as treasurer and as a member of the Company's board of directors. ECF 51, ¶¶ 8-9; ECF 57, ¶¶ 8-9. For these services, Scott received annual compensation in excess of $300,000. ECF 51, ¶10; ECF 57, ¶10. Upon O'Neil's

---

[1] The following facts are derived from: (1) the Plaintiffs' Concise Statement of Material Facts, ECF No. 51, (2) Defendant's Response thereto and statement of additional facts, ECF No. 57, and (3) Plaintiffs' reply to Defendant's statement of additional facts, ECF No. 62. Where relevant, the Court also cites portions of the evidentiary record.

Unless otherwise noted, the following facts are not genuinely disputed. For purposes of this Memorandum Opinion, any genuinely disputed facts are construed in the light most favorable to the Defendant as the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[2] Although the Company also has non-voting shareholders, their status is not material to the pending motion. Therefore the Court's discussion and analysis is limited to the voting shareholders.

2

recommendation, Matt Totzke ("Totzke") became the new CEO when O'Neil stepped down from that position. ECF 51, ¶8; ECF 57, ¶8.

Over the ensuing years, events transpired which led to a falling out between O'Neil and the Larsons. There is some disagreement in the record as to what underlay the parties' differences. Deanna Larson perceived that O'Neil "had a different vision for [the] company," as compared to the other shareholders. ECF No. 51-2, Deanna Larson Depo. at 15. Roland Larson and Jill Larson Im both testified that the family members wanted to grow the company and invest in new directions, whereas O'Neil was less interested in reinvesting profits back into the business. ECF No. 51-4, Roland Larson Depo. at 22-23; ECF No. 51-5, Jill Larson Im Depo. at 23. Timothy ("Tim") Larson maintains that it was a "fairly regular occurrence" for O'Neil to yell during board meetings and "occasionally to storm out," which Tim felt was "getting in the way of running" the Company. ECF No. 51-3, Tim Larson Depo. at 31. But whereas Tim Larson described O'Neil's behavior as verbally "abusive" toward others, Totzke denied any awareness of verbal abuse during his seventeen-year working relationship with O'Neil. *See* ECF No. 51-3, Tim Larson Depo. at 19-20; ECF No. 51-7, Totzke Depo. at 12-13. For his part, O'Neil perceived that the Larsons wanted him out of the business because he was the only non-family shareholder. ECF No. 51-1, O'Neil Depo. at 38-40.

In any event, matters came to a head between O'Neil and the other shareholder/directors, starting in mid-2018. During a board of directors meeting held on May 15, 2018, a disagreement arose concerning O'Neil's belief that the Company should obtain market research for one of Larson Texts' signature products. ECF No. 51-6; *see also* ECF 51, ¶15; ECF 57, ¶15. As a result of this disagreement, both Roland Larson and O'Neil wound up leaving the meeting. *Id*.

3

The following morning (May 16, 2018), Totzke emailed the board members with proposed dates for their next meeting. O'Neil sent Totzke a one-sentence reply, stating simply: "I will not be attending any more Larson Board meetings." ECF No. 51-8.

At some point around this time or shortly thereafter, O'Neil had a conversation with Totzke in which he remarked that "if [the other shareholders] wanted me [to], I would sell my shares." ECF 51, ¶19; ECF 57, ¶19; ECF No. 51-1, O'Neil Depo. at 36-37, 42. O'Neil claims he made this statement because he was under the impression that the Larsons "didn't want [him] there." ECF No. 51-1, O'Neil Depo. at 38. In a subsequent email dated May 22, 2018, Totzke outlined a proposal whereby O'Neil would immediately resign and pledge his shares to the Company and, in return, he would be compensated for his shares based on a valuation of the Company as of December 31, 2019. ECF 51, ¶20; ECF 57, ¶20; *see* ECF No. 51-9. Despite broaching the possible sale of his shares, O'Neil claims he was "shocked" by the May 22, 2018 purchase offer and felt like it "was out of the blue." ECF No. 51-1, O'Neil Depo. at 37. In any event, O'Neil never accepted the offer outlined in Totzke's email.

At the next meeting held on June 7, 2018, the board voted, by a 4 to 1 majority, to eliminate the "extra" salary paid to the office of treasurer. Additionally, the board elected to place Totzke in that position in lieu of O'Neil. ECF 51, ¶21; ECF 57, ¶21; ECF No. 62, ¶65; ECF No. 51-10. All four of the Larson family board members voted in favor of these measures while O'Neil, through his attorney acting as proxy, voted against. *Id.* In addition to serving as treasurer, Totzke continued to serve as the Company's president, while Deanna Larson continued to serve as secretary. Because only the "extra" salary paid for the office of treasurer was being eliminated, both Totzke and Deanna Larson continued to receive compensation for serving in their respective roles as CEO and secretary. And although O'Neil was removed from the

treasurer position, he remained on the Company's board of directors and continued to receive a salary for that position. ECF No. 51-10.

Later that summer, however, during a special meeting held on August 22, 2018, the four Larson family directors voted to reduce O'Neil's salary to zero dollars, effective immediately. ECF No. 62, ¶67; ECF No. 51-11. O'Neil, through his attorney acting as proxy, voted against the measure. *Id.*

That same month, Deanna Larson was chosen to replace O'Neil as the manager of Norcross Land Management, LLC, a related entity that owns the Company's real estate. ECF No. 57-1; ECF No. 62, ¶66. This change occurred at a special meeting of the LLC's members held on August 3, 2018, during which all four Larson family members voted in favor of the change in management. ECF No. 57-1. Although O'Neil and his attorney had both been notified of the meeting, neither of them attended. *Id.*

Additional changes at Larson Texts ensued in the Fall of 2018. At a special meeting of shareholders held on November 6, 2018, the four Larson family members voted to adopt a resolution amending the Company's Articles of Incorporation. This amendment allowed the voting shareholders to remove the entire Board of Directors, with or without cause, by majority vote. ECF No. 51-12; ECF 51, ¶23; ECF 57, ¶23; ECF No. 62, ¶68. Only O'Neil voted against the proposed amendment. ECF No. 51-12.

Three days later, on November 9, 2018, the board adopted a resolution reducing the number of directors from 5 to 3. ECF No. 51-13; ECF 51, ¶24; ECF 57, ¶24; ECF No. 62, ¶69. That same date, a majority of the voting shareholders approved a resolution to remove the existing 5-member board and reconstitute a 3-person board, to be comprised of Timothy Larson, Deanna Larson, and Jill Larson Im. ECF No. 51-14; CF 51, ¶25; ECF 57, ¶25; ECF No. 62, ¶69.

All of these actions were approved by the four Larson family members, with O'Neil voting his shares against them. ECF No. 51-13; ECF No. 51-14; ECF 51, ¶¶26, 28; ECF 57, ¶¶26, 28. As a result of the actions taken by the board and the shareholders, O'Neil's employment with Larson Texts was also terminated, effective November 9, 2018. ECF No. 57-2; ECF No. 62, ¶70. But despite his termination as a salaried employee of Larson Texts, O'Neil currently remains a twenty percent (20 %) voting shareholder.

O'Neil's shareholder status has placed him at the center of a dispute with the Larsons concerning the Company's borrowing needs. Because orders for Larson Texts' products generally coincide with the start of the school year, the Company tends to receive most of its revenue in the second half of the calendar year. ECF No. 51, ¶29; ECF No. 57, ¶29. To ensure that it has sufficient cash on hand for operations throughout the year, Larson Texts has traditionally relied on various loans and lines of credit. ECF No. 51, ¶30; ECF No. 57, ¶30. For at least the past 15 years, the Company's lender has required that all of Larson Texts' voting shareholders (including O'Neil) provide personal guaranties to secure Larson Texts' loans. ECF No. 51, ¶31; ECF No. 57, ¶31. Until 2019, all voting shareholders had agreed to do so. ECF No. 1, ¶16; ECF No. 19, ¶16.

In 2019, however, the Company sought to increase its borrowing capacity by securing an additional $3 million loan. ECF No. 51-15. In the early part of that year, Larson Texts learned that O'Neil had written to the Company's lender, Erie Bank, advising that he would not personally guarantee any future loans. ECF No. 51, ¶32; ECF No. 57, ¶32. This prompted inquires as to whether Erie Bank would agree to lend the required funds if most, but not all, voting shareholders provided guaranties for the new indebtedness. Erie Bank indicated its amenability to such an arrangement. ECF No. 51, ¶33; ECF No. 57, ¶33.

Accordingly, Larson Texts created a plan (the "Guaranty Plan") that offered compensation -- in the form of additional voting shares -- to any voting shareholder who agreed to provide a guaranty for the new loan. ECF No. 51, ¶34; ECF No. 57, ¶34. The plan's primary terms were that, in exchange for a shareholder's personal guaranty of the new loan, Larson Texts would issue to that shareholder a quantity of voting stock based on: (i) the overall value of the guaranty (which was determined to be $60,000), (ii) the number of shareholders participating, and (iii) the value of a voting share in Larson Texts as of April 30, 2019. ECF No. 51, ¶35; ECF No. 57, ¶35. The plan further provided that Larson Texts would engage its longtime valuation firm, McGill, Power, Bell and Associates ("MPB"), to conduct a valuation of the company as of April 30, 2019. ECF No. 51, ¶36; ECF No. 57, ¶36. MPB had performed all of the outside accounting work for Larson Texts and its related entities for many years prior to 2019. ECF No. 51, ¶37; ECF No. 57, ¶37.

Although Larson Texts offered the Guaranty Plan to all voting shareholders, O'Neil elected not to participate in the plan. ECF No. 51, ¶39; ECF No. 57, ¶39. O'Neil's reasoning for not participating was that he had "no management input," was "not on the board anymore," and was not drawing any salary or other compensation, apart from shareholder distributions. ECF No. 51, ¶40; ECF No. 57, ¶40.

Consistent with the terms of the Guaranty Plan, MPB proceeded with its valuation and ultimately concluded that, as of April 30, 2019, a single voting share in Larson Texts was worth $25.53. ECF No. 51, ¶¶41-42; ECF No. 57, ¶¶41-42. Based on this valuation (the accuracy of which O'Neil disputes), the Guaranty Plan would provide each of the participating Larson family members an additional 611 shares of voting stock. ECF No. 51, ¶43; ECF No. 57, ¶43.

After MPB submitted its report, Larson Texts called a shareholders' meeting to seek agreement on the proposed valuation. ECF No. 51, ¶43; ECF No. 57, ¶43. While the Larsons supported MPB's valuation, O'Neil contested its accuracy, objected to the issuance of any shares under the Guaranty Plan, and accused Larson Texts' and the Larson family shareholders of engaging in self-dealing and wrongdoing related to the Guaranty Plan. ECF No. 51, ¶44; ECF No. 57, ¶44. In essence, O'Neil contends that MPB's 2019 valuation produced an artificially low stock price which, if adopted, would result in the Larson family members receiving a disproportionate number of additional voting shares. In short, O'Neil views the Guaranty Plan as an effort by the Larsons to "force him out" of the Company. ECF No. 51, ¶45; ECF No. 57, ¶45.

## II.   PROCEDURAL BACKGROUND

To address this controversy, Larson Texts and the family director/shareholders filed this declaratory judgment action asking the Court to issue a judgment declaring that: (1) the Guaranty Plan does not violate any of the Plaintiffs' obligations to O'Neil, (2) the April 30, 2019 valuation performed by MPB represents a valid valuation of the business as of its effective date, (3) Larson Texts may follow through with the Guaranty Plan by issuing shares to the participating shareholders, and 4) none of the aforementioned actions violate O'Neil's rights as a minority shareholder in Larson Texts. ECF No. 1. In response to the Declaratory Judgment Complaint, O'Neil asserted counterclaims against Larson Text and the Larson family members for alleged breach of fiduciary duty (Counterclaim I), minority shareholder oppression (Counterclaim II), and civil conspiracy (Counterclaim III).

Plaintiffs have since filed the pending Rule 56 motion, which seeks summary judgment on all counterclaims that are *not* predicated on their involvement in the Guaranty Plan. The motion has been adequately briefed and joined and is now ripe for resolution.

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If the moving party satisfies this burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks and citation omitted). In conducting its analysis, the court must construe the record and any reasonable inferences in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.*

## IV.   DISCUSSION

### A. *Defendant's Shareholder Oppression Claim*

Plaintiffs' motion in this case seeks partial summary judgment "on all of Defendant's Counterclaims other than those focused on Plaintiffs' Guaranty Plan." ECF No. 52 at 1.

9

O'Neil's first counterclaim asserts a breach of fiduciary duty claim based entirely on Plaintiffs' involvement in the Guaranty Plan; accordingly, Plaintiffs have not sought summary judgment on that claim. Instead, they direct their motion at Counterclaims II and III.

But although Plaintiffs' motion presents a seemingly straightforward request, it does not result in an entirely straightforward analysis relative to Counterclaim II. In that claim, O'Neil asserts that Plaintiffs engaged in oppressive conduct through the following actions:

 a. [V]oting to approve a Guaranty Compensation Plan following the removal of Defendant O'Neil from the Board of Directors and eliminating his salary and benefits.

 b. [D]evising a Guaranty Plan and a 2019 valuation of Stock . . . which in effect dilutes Defendant O'Neil's stock ownership in the corporation.

 c. Engaging in . . . mismanagement of the affairs of the corporation in that the Plaintiffs . . . sought borrowing to pay themselves excessive salaries, director fees and shareholder distributions rather than to effectively manage the expenses and debts of the corporation.

 d. Engaging in activities that constitute the improper valuation of voting stock in the corporation relative to the 2019 valuation . . . by supplying information to the valuation firm that was designed to suppress the value of the stock and thereby allowing the Plaintiff shareholders to acquire more shares for themselves to the detriment of O'Neil.

\*\*\*

 f. Engaging in financial transactions to benefit themselves by effectively borrowing money to pay themselves excessive salaries, director fees and shareholder distributions in the face of violation of financial covenants with banking institutions.

 g. Engaging in activities and actions which have the effect of freezing out Defendant O'Neil as a minority shareholder.

ECF No. 19, ¶18(a)-(d), (f) and (g).[3]

---

[3] Subsection (e), omitted above, is redundant of other allegation in that it also refers to Plaintiffs' "scheme to proceed with the Guaranty Compensation Plan and the 2019 Valuation" and their alleged efforts to "grant themselves additional shares in the corporation to the detriment to Defendant O'Neil..." ECF No. 19, ¶18(e).

As these allegations demonstrate, O'Neil's "shareholder oppression" claim is substantially predicated on Plaintiffs' actions relative to the Guaranty Plan. To that extent, the claim is arguably redundant of Counterclaim I and also unsuitable for summary judgment because, as Plaintiffs recognize, the Guaranty Plan involves disputed issues of material fact. What the parties mostly focus on in their memoranda is O'Neil's allegation that he has been "frozen out" of the Company through Plaintiffs' actions. But even this part of the Court's analysis is not entirely straightforward because, while O'Neil has alleged a "freeze out" in the context of "shareholder oppression," such allegations commonly arise in the context of claims asserting breach of fiduciary duty, which are closely related to (and sometimes overlap with) claims of shareholder oppression. Some discussion of the governing principles is necessary to frame the Court's inquiry.

Under Pennsylvania law, majority shareholders of a corporation owe a fiduciary duty to minority shareholders. *Minehan v. McDowell*, No. 21-CV-05314-CFK, 2022 WL 3563542, at *7 (E.D. Pa. Aug. 18, 2022) (citing *Retina Assocs. of Greater Phila., Ltd. v. Retinovitreous Assocs., Ltd.*, A.3d 263, 277 (Pa. Super. Ct. 2017)). This fiduciary duty prevents majority shareholders from using their power to exclude minority shareholders from their share of the benefits. *Id.* (citing *Ferber v. Am. Lamp Corp.*, 469 A.2d 1046, 1050 (Pa. 1983)). "This does not mean, of course, that majority shareholders may never act in their own interest, but when they do act in their own interest, it must be also in the best interest of all shareholders and the corporation." *Ferber v. Am. Lamp Corp.*, 469 A.2d 1046, 1050 (Pa. 1983) (citing *Weisbecker v. Hosiery Wide Patents, Inc.*, 51 A.2d 811, 814, 817 (Pa. 1947)).

"Pennsylvania courts recognize that freezing out a minority shareholder 'for the benefit of the majority shareholders constitutes a breach of the majority shareholders' fiduciary duty to

11

the minority shareholders.'" *Minehan*, 2022 WL 3563542, at *7 (quoting *Ford v. Ford*, 878 A.2d 894, 905 (Pa. Super. Ct. 2005). "The term 'freeze-out' is often used as a synonym for 'squeeze-out.'" *Linde v. Linde*, 220 A.3d 1119, 1142 (Pa. Super. Ct. 2019) (citing 1 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS § 1:1).

> By the term "squeeze-out" is meant the use by some of the owners or participants in a business enterprise of strategic position, inside information, or powers of control, or the utilization of some legal device or technique, to eliminate from the enterprise one or more of its owners or participants.... [The term "partial squeeze-out" means an] action which reduces the participation or powers of a group of participants in the enterprise, diminishes their claims on earnings or assets, or otherwise deprives them of business income or advantages to which they are entitled. A squeeze-out normally does not contemplate fair payment to the squeezees for the interests, rights, or powers which they lose.
>
> ...

*Id.* at 1141–42 (citing 1 O'NEAL & THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS & LLC MEMBERS § 1:1).

Stated differently, "[m]ajority shareholders may not use the corporate process to deny a minority shareholder his right to participate or to exclude the minority shareholder from the proper share of benefits." *Mineham*, 2022 WL 3563542, at *7 (citing *Viener v. Jacobs*, 834 A.2d 546, 556 (Pa. Super. Ct. 2003)). "Courts may find that a minority shareholder has been frozen out when that shareholder's power or compensation is substantially diminished by means of generally oppressive conduct, restriction of their employment in or access to the corporation, payment of excessive salaries to majority shareholders, withholding of information, and exclusion of minority shareholders from decision-making." *Id.* (citing *Bair v. Purcell*, 500 F. Supp. 2d 468, 484 (M.D. Pa. 2007)). *See also Orchard v. Covelli*, 590 F. Supp. 1548, 1557 (W.D. Pa. 1984), *aff'd*, 802 F.2d 448 (3d Cir. 1986), *and aff'd sub nom. Appeal of Orchard*, 802 F.2d 448 (3d Cir. 1986) ("Tactics employed against a minority shareholder to effect a squeeze

12

out can take on many forms including generally oppressive conduct, the withholding of dividends, restricting or precluding employment in the corporation, paying excessive salaries to majority stockholders, withholding information relating to the operation of the corporation, appropriation of corporate assets, denying dissenting shareholders appraisal rights, failure to hold meetings and excluding the minority from a meaningful role in the corporate decision-making.") In the context of a claim alleging shareholder oppression, "[o]ppressive actions refer to conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Ford v. Ford*, 878 A.2d 894, 900 (Pa. Super. Ct. 2005) (citation omitted).

Plaintiffs argue that, as a matter of law, O'Neil cannot maintain a claim for shareholder oppression because he was not denied any of the rights attendant to his share ownership. To that end, Plaintiffs seek to distinguish a number of cases cited by O'Neil, in which the courts found evidence of oppression based on conduct by majority shareholders that Plaintiffs view as materially more draconian.[4] Plaintiffs point out that, since his retirement as CEO, O'Neil has

---

[4] *See, e.g., Linde v. Linde*, 220 A.3d 1119, 1142 (Pa. Super. Ct. 2019) (majority shareholder "changed the role of the secretary of the corporation; changed the quorum requirements for transacting business; amended the by-laws to eliminate cumulative voting; and, empowered the single majority shareholder to remove the entire board without cause…in furtherance of [his] expressed desire to get [the minority shareholder] 'out of his life' and to economically 'destroy [her].'"); *Orchard v. Covelli*, 590 F.Supp. 1548 (W.D. Pa. 1984), *aff'd*, 802 F.2d 448 (3d Cir. 1986) (majority shareholder had breached the fiduciary duties owed to the minority shareholder by engaging in conduct that included a refusal to pay dividends and refusing to pay the minority shareholder for interest in renewed franchise); *Ferber v. Am. Lamp Corp.*, 503 Pa. 489, 496, 469 A.2d 1046, 1049–50 (1983) (majority shareholders "disregarded their father's wish that their sister [a minority shareholder] be provided for in some significant way from the profits of the family business"); *Ford v. Ford*, 878 A.2d 894, 904 (Pa. Super. Ct. 2005) (majority shareholder's diversion of financial benefit from minority shareholders to himself was oppressive); *Viener v. Jacobs*, 2003 PA Super 324, ¶ 22, 834 A.2d 546, 556 (Pa. Super. Ct. 2003) (company's "assets and opportunities were squandered while the company was in dire financial straits in a bizarre corporate machination designed to benefit [majority shareholder]");

13

received shareholder distributions in the exact same manner as all the Larson family shareholders, totaling nearly $5 million dollars. They insist that he has not been denied information about the Company, prevented from voting, or "deprived" of employment. Regarding O'Neil's removal from the positions of treasurer and director, Plaintiffs maintain that this was the result of the May 16, 2018 email wherein O'Neil stated that he would not be attending any more board meetings. Indeed, Plaintiffs insist "[t]here can be no argument that O'Neil's unilateral and voluntary action of removing himself from board participation, and its natural consequences of no longer being paid for such participation, constitutes oppression." ECF No. 52 at 7.

While Plaintiffs' argument has some force, the Court is not persuaded that O'Neil's claim of shareholder oppression is amenable to resolution at the summary judgment stage. Upon his removal from the positions of treasurer and director, O'Neil lost his employment with Larson Texts and, with it, annual income in excess of $300,000, health insurance, ready access to information such as corporate emails, and (presumably) a degree of managerial oversight. Whether this diminishment in O'Neil's power and compensation was substantial enough to constitute an unlawful "freeze out" or otherwise "oppressive" conduct is a debatable issue that must be resolved by a factfinder at trial. None of the cases distinguished by Plaintiffs compel resolution of these issues at the Rule 56 stage.

As noted, Plaintiffs attribute O'Neil's removal to his own actions in sending the May 16, 2018 email, which Plaintiffs appear to construe as a sort of *de facto* resignation. Certainly, a factfinder could conclude that O'Neil lacked any reasonable expectation of continued

---

*Bair v. Purcell*, 500 F.Supp.2d 468 (M.D. Pa. 2007) (minority shareholder removed from board of directors over his objection and then excluded from any financial benefit of his shares).

14

employment at Larson Texts following his statement that he did not plan to attend future board meetings. But however persuasive that argument might be, the Court is not convinced that it must be accepted as a matter of law. Here, O'Neil has testified concerning a meeting that occurred prior to May 15, 2018, during which Tim Larson "stood up... and called [O'Neil] all sorts of names." ECF No. 51-1, O'Neil Depo at 38:20-22. According to O'Neil, the family's conduct at that meeting left him with the impression that they wanted him out of the Company. *Id.* at 38:24-39:8. After O'Neil made his comment to Totzke about selling his shares, he received the proposed buyout terms, which he never accepted. Thereafter, notwithstanding his May 16, 2018 email, O'Neil continued to participate in board meetings either remotely by phone or indirectly through his attorney acting as a proxy. In any event, much of the board's business between June 7, 2018 and November 9, 2018 appears to have involved measures adverse to O'Neil's employment and participation in the Company. Viewing the evidence most favorably to O'Neil, a factfinder might conclude that O'Neil did not intend to immediately sever his employment with the Company, despite his falling out with the Larsons and his statement in the May 16, 2018 email. In addition, a factfinder might infer that the Larsons were trying to push O'Neil out of the business and that their actions between June 7 and November 9, 2018 were undertaken as a result of his rejection of the Company's offer to purchase his shares, rather than in response to his May 16, 2018 email.

In sum, whether O'Neil had any reasonable expectation of continued employment and/or involvement on the board of directors after May 16, 2018 is a factual question that must be resolved at trial. Similarly, whether or not the Larsons' actions "substantially defeated" any reasonable expectations on the part of O'Neil involves factual inquiries that are not amenable to resolution on the current record. And, to the extent O'Neil's intentions and/or the Larsons'

motives bear on the shareholder oppression claim, those issues are also inherently factual and best reserved for a factfinder to assess at time of trial. *See Grill v. Aversa*, No. 1:12-CV-120, 2014 WL 4672461, at *4 (M.D. Pa. Sept. 18, 2014) ("[I]t is well-settled that: 'Motive is a question of fact that must be decided by the [fact-finder], which has the opportunity to hear the explanations of both parties in the courtroom and observe their demeanor.'") (citing authority).

As for the allegation that the family members paid themselves excessive compensation, Plaintiffs have presented evidence that there was no material change in the payments they received following O'Neil's termination. However, the Court also notes O'Neil's testimony that, *during* his tenure on the board, "significant adjustments" were made to Roland Larson's salary which were never submitted for a vote but, rather, presented as *a fait accompli*. ECF No. 51-1, O'Neil Depo. at 101-102. Plaintiffs have submitted evidence which confirms that Roland Larson received substantially higher wages than the other shareholder/employees during the time period 2018 to 2021. ECF No. 66. And while Roland Larson testified about the extensive work he still performs for the Company, O'Neil contests that point, giving rise to a genuinely disputed issue of fact. *See* ECF No. 51-1, O'Neil Depo. at 108-109; ECF No. 51-4, Roland Larson Depo. at 33-34.

In addition, there is evidence showing that, between 2018 and 2020, Larson Texts paid substantial sums to Grant Larson Productions, LLC, a company owned by Tim Larson, his wife, and his daughter. According to Tim Larson, this LLC undertakes production work for Larson Texts on a contractual, "job-by-job" basis. ECF No. 51-3, Timothy Larson Depo. at 104. At present, however, the record is underdeveloped concerning the nature of the work provided by Grant Larson Productions, LLC, the extent to which such work has benefitted Larson Texts, and

the degree to which the contractual arrangements between the two companies were at arms' length.

The Pennsylvania Supreme Court has stated that a majority shareholder's fiduciary position does not mean that majority shareholders may never act in their own interest, "but when they do act in their own interest, it must be also in the best interest of all shareholders and the corporation." *Ferber v. Am. Lamp Corp.*, 469 A.2d 1046, 1050 (1983). Notably, "'Pennsylvania law shifts the burden onto the fiduciary to prove that a transaction is fair and not fraudulent when the fiduciary acts to benefit himself while in the fiduciary role.'" *Bair v. Purcell*, 500 F. Supp. 2d 468, 484 (M.D. Pa. 2007) (*quoting also Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 100–101 (3d Cir. 2001)). Based on the limited record before the Court, the undersigned cannot make any legally conclusive determinations as to whether Roland Larson, Timothy Larson and/or Grant Larson Productions, LLC received excessive compensation from Larson Texts. For this reason and the others stated above, the Court cannot conclude that summary judgment is warranted as to the totality of O'Neil's shareholder oppression claim.

On the other hand, the Court does agree that certain aspects of O'Neil's shareholder oppression claim are untenable as a matter of law. For one, the record does not support the existence of a genuinely disputed issue of fact relative to O'Neil's allegations of corporate mismanagement. Indeed, as Plaintiffs point out, when O'Neil was questioned about this allegation, he admitted that he did not believe the Company is being mismanaged, just that it has a "different type of management" now. ECF No. 51, ¶62; ECF No. 57, ¶62; ECF No. 51-1, O'Neil depo. at 96:2-22. Nor is the Court aware of any evidence to support O'Neil's averment that Plaintiffs have in any way violated their financial covenants with the Company's banking institutions. Accordingly, Plaintiffs are entitled to summary judgment insofar as O'Neil's

counterclaim for shareholder oppression is based on these allegations. In all other respects, the Plaintiffs' motion for summary judgment relative to Counterclaim II will be denied.

### B. Defendant's Civil Conspiracy Claim

In his third counterclaim, O'Neil alleges that the Plaintiffs "entered into an agreement" to deprive him of his rights as a shareholder, to oppress him as a shareholder, and "to otherwise breach statutory and common law duties owed to him . . ." ECF No. 19 at 16, ¶20. O'Neil predicates this claim on the same conduct that forms the basis of his breach-of-fiduciary-duty and shareholder oppression claims. *See id.* ¶21.

Plaintiffs have moved for summary judgment on two grounds. First, they allege that O'Neil cannot prove the existence of a conspiracy. Second, Plaintiffs contend that the conspiracy claim is barred by the "intra-corporate conspiracy doctrine," discussed below.

The essential elements of a claim for Pennsylvania common law civil conspiracy are: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage. *Allison v. Chesapeake Energy Corp.*, No. CIV.A. 12-0900, 2013 WL 787257, at *11 (W.D. Pa. Jan. 29, 2013) (citing *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. Ct. 2008)), *report and recommendation adopted*, No. 2:12CV900, 2013 WL 787180 (W.D. Pa. Mar. 1, 2013); *see also Bair v. Purcell,* 500 F. Supp. 2d 468, 500 (M.D. Pa. 2007). What is missing in this case, according to Plaintiffs, is any proof that they committed an unlawful act or had an unlawful purpose. Plaintiffs maintain that, at most, O'Neil has shown that the Larsons had a disagreement with him about the manner in which the Company should be run; but mere "[d]isagreement is not unlawful." ECF No. 52 at 8. But the

Court has already found that there are material issues of disputed fact concerning O'Neil's allegations of shareholder oppression, and it is clear on this record that each of the four Larson family members participated in the corporate decisions that underlay that claim. The Court is therefore not inclined to accept Plaintiffs' first basis for summary judgment.

On the other hand, Plaintiffs' second ground appears to have merit. Because a corporation can act only through its officers and employees, the intra-corporate conspiracy doctrine recognizes that "an entity cannot conspire with one who acts as its agent." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003). "[S]imilarly, agents of a single entity cannot conspire among themselves." *Rutherfoord v. Presbyterian-University Hosp.*, 612 A.2d 500, 508 (Pa. Super. Ct. 1992). Courts have recognized an exception to this rule "'when the employees have acted for their sole personal benefit' because these actions would therefore be 'outside the course and scope of their employment.'" *See Houser v. Feldman*, 600 F. Supp. 3d 550, 570 (E.D. Pa. 2022) (quoting *Heffernan v. Hunter*, 189 F.3d 405, 412-13 (3d Cir. 1999)). Here, Plaintiffs argue that, at all times, they were acting as agents of Larson Texts and, as such, they were legally incapable of conspiring with each other. The Court agrees and, notably, O'Neil does not specifically acknowledge or attempt to rebut this point. Because the intra-corporate conspiracy doctrine precludes O'Neil from establishing a conspiracy between two or more of the Plaintiffs, the conspiracy claim fails as a matter of law.

## V.    CONCLUSION

Based upon the foregoing reasons, the Plaintiffs' motion for a partial grant of summary judgment will be granted as to Counterclaim II, insofar as Defendant's "shareholder oppression" claim is predicated on averments of corporate mismanagement and/or a breach of financial

19

covenants. The motion will also be granted as to Counterclaim III. In all other respects, the motion will be denied.

      An appropriate order follows.

                                                              /s/ Susan Paradise Baxter  
                                                              Susan Paradise Baxter  
                                                              United States District Judge